UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

DANIELLA ANNARINO O/B/O E.L.F. III,

      Plaintiff,

     v.                                         18-CV-238
                                              DECISION AND ORDER
COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

───────────────────────────────

On February 14, 2018, the plaintiff, Daniella Annarino, brought this action under the Social Security Act ("the Act") on behalf of the claimant, E.L.F. III ("E.L.F."), a minor child under 18 years of age. She seeks review of the determination by the Commissioner of Social Security ("Commissioner") that E.L.F. was not disabled. Docket Item 1. On January 28, 2019, Annarino moved for judgment on the pleadings, Docket Item 13; on March 29, 2019, the Commissioner responded and cross-moved for judgment on the pleadings, Docket Item 16; and on April 19, 2019, Annarino replied, Docket Item 17.

For the reasons stated below, this Court grants Annarino's motion in part and denies the Commissioner's cross-motion.

**BACKGROUND**

**I.     PROCEDURAL HISTORY**

On January 30, 2014, Annarino applied for Children's Supplemental Security Income benefits on behalf of E.L.F.  Docket Item 10 at 90, 156-61.  Annarino claimed that E.L.F. had been disabled since June 1, 2011, and was currently disabled.  *Id.* 156.

On June 6, 2014, Annarino received notice that her application was denied because E.L.F. was not disabled under the Act.  *Id.* at 90.  She requested a hearing before an administrative law judge ("ALJ"), *id.* at 115-17, which was held on May 13, 2016, *id.* at 76-89.  The ALJ then issued a decision on June 17, 2016, confirming the finding that E.L.F. was not disabled.  *Id.* at 12-32.  Annarino appealed the ALJ's decision and included additional evidence.  *Id.* at 6.  The Appeals Council found that the additional evidence "did not show a reasonable probability that it would change the outcome of the decision" and therefore "did not consider and exhibit [that] evidence."  *Id.* at 6.  Annarino's appeal was denied, and the decision then became final.  *Id.* at 5-8.

**II.    CHILDREN'S DISABILITY STANDARD**

A child under 18 is disabled under section 1614(a)(3)(C)(i) of the Act if he or she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  In denying Annarino's application, the ALJ evaluated her claim under the Social Security Administration's three-step evaluation process to determine whether an individual under the age of 18 is disabled.  *See* 20 C.F.R. § 416.924(a).

At the first step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity ("SGA"), defined as work activity that is both substantial and gainful. *Id.* § 416.972. "Substantial work activity" involves significant physical or mental activities. *Id.* § 416.972(a). "Gainful work activity" is work usually done for pay or profit, whether or not profit is realized. *Id.* § 416.972(b). If the claimant is engaged in SGA, the claimant is not disabled regardless of medical condition, age, education, or work experience. *Id.* at § 416.924(b). If the claimant is not engaged in SGA, the ALJ proceeds to the next step. *Id.*

At step two, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe." *Id.* at § 416.924(a). For a claimant under the age of 18, a medically determinable impairment or combination of impairments is not severe if it is a slight abnormality or a combination of such abnormalities that causes no more than minimal functional limitations. *Id.* § 416.924(c). If the claimant has a severe impairment, the ALJ proceeds to the third step. *Id.* § 416.924(a).

At step three, the ALJ must determine whether the impairment or combination of impairments meets, medically equals, or functionally equals an impairment in the listings. *Id.* § 416.924(d). If the claimant has an impairment or combination of impairments that meets, medically equals, or functionally equals the severity of one in the listings, and if such impairments have lasted or are expected to last for a continuous period of at least 12 months, then the claimant is disabled. *Id.* § 416.924(d). If not, then the claimant is not disabled. *Id.*

3

To determine whether impairments functionally equal one in the listings, the ALJ assesses the claimant's functioning in six separate "domains": (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  *Id.* § 416.926a(b)(1).  That assessment compares how the child performs in each of these domains with the typical functioning of a child of the same age without impairment.  *Id.* § 416.926a(b).  The child's impairment is of listing-level severity if there are "marked" limitations in at least two domains or an "extreme" limitation in one domain.  *Id.* § 416.926a(d).  In determining whether limitations are "marked" or "extreme," the ALJ considers functional limitations that result from all impairments, including impairments that have been deemed not severe, and their cumulative effects.  *Id.* §§ 416.923, 416.924a(b)(4), 416.926a(a), (c), and (e)(1)(i).

A "marked" limitation results when impairments "seriously interfere with [the child's] ability to independently initiate, sustain, or complete activities."  *Id.* § 416.926a(e)(2)(i).  A "marked" limitation is "more than moderate" but "less than extreme."  *Id.*  On a standardized test designed to measure abilities within a certain domain, a "marked limitation" means a score of at least two, but less than three, standard deviations below the mean and a level of day-to-day functioning consistent with that score.  *Id.* § 416.926a(e)(2)(i), § 416.926a(e)(2)(iii).  For example, in the domain of "health and well-being," a child is considered to have a "marked" limitation if he or she is frequently ill as a result of his or her impairments or exhibits frequent worsening of symptoms resulting in medically-documented exacerbations.  *Id.* § 416.926a(e)(2)(iv).  "Frequent" means episodes that occur on average every four

4

months and last two weeks or more, or that occur more often than three times a year but last less than two weeks, or that occur less often but are of overall equivalent severity. *Id.*

An "extreme" limitation, on the other hand, results when impairments "interfere[ ] very seriously with [the child's] ability to independently initiate, sustain, or complete activities." *Id.* § 416.926a(e)(3)(i). An "extreme" limitation is one that is "more than marked." *Id.* The ALJ will find that a limitation is "extreme" when a comprehensive standardized test designed to measure functioning in a particular domain results in a score of three or more standard deviations below the mean and day-to-day functioning consistent with that score. *Id.* § 416.926a(e)(3)(iii). In the domain of "health and well-being," for example, the ALJ will consider a child to have an "extreme" limitation if the child is frequently ill or if impairments frequently become exacerbated, resulting in medically documented symptoms significantly more than those of a "marked" limitation. *Id.* § 416.926a(e)(3)(iv).

### III. RELEVANT MEDICAL EVIDENCE

The following summarizes the medical evidence most relevant to Annarino's claim. E.L.F. was examined by a number of providers, but only those reports completed by the Buffalo Public Schools' Preschool Committee on Special Education; the Buffalo Public Schools' Committee on Special Education; Jennifer Meyer, M.D.; and Allentown Pediatrics are of significance to the claim of disability here.

#### A. Buffalo Public Schools' Committees

In March and April 2014, the Buffalo Public Schools' ("BPS") Preschool Committee on Special Education (the "Preschool Committee") completed psycho-

5

educational testing on E.L.F. to determine whether he was eligible for preschool special education services.  Docket Item 10 at 332-83.  The evaluation team included Jennifer L. Zakrzweski, M.S.Ed.; occupational therapist Jennifer M. Schneider, OTR/L; physical therapist Jessica Anibaldi, DPT; school psychologist Randall Zakrzweski, M.A.; and speech and language pathologist Corinne Helms, M.S. and CCC-SLP.  *Id.*

On March 28, 2014, Ms. Zakrzweski observed E.L.F. at home and noted that he "was extremely self-directed" and "needed constant prompts and reminders to sit appropriately and participate and he often refused to complete tasks. . . . He did not comply consistently and eventually refused to continue."  *Id.* at 340.  She further noted that he "often presented as an angry little boy.  He was extremely defiant and noncompliant.  His self-directed tendencies, limited compliance, short attention span and poor social skills are significant concerns in the social emotional domain."  *Id.* at 341.  She concluded that his "[s]ocial/emotional skills were . . . severely delayed."  *Id.*

On April 3, 2014, Ms. Anibaldi used the Peabody Developmental Motor Scales, 2nd Edition ("PDMS-2"), to measure E.L.F.'s gross motor skills.  She concluded that E.L.F., 44-months old at the time of evaluation, demonstrated "gross motor skills at a 21-month-old level, indicating a severe delay in overall age appropriate gross motor skills."  *Id.* at 345.

On March 31, 2014, Ms. Schneider administered the PDMS-2 to assess E.L.F.'s fine motor skills.  Both his grasping and visual motor integration skills were in the 5th percentile, with an overall fine motor quotient in the 2nd percentile among children his age.  *Id.* at 359.  These scores indicated that E.L.F. had a "severe delay."  *Id.*

6

On April 5, 2014, Mr. Zakrsweski administered the Stanford Binet Intelligence Scales, 5th Edition ("SB-5"), and Vineland Adapting Behavior Scales, 2nd Edition ("VABS-2"). E.L.F.'s performance on the SB-5 "revealed overall cognitive functioning at the 7th percentile and within the [b]orderline [d]elayed range." *Id.* at 368. His full-scale IQ was measured at 78, which fell in the 7th percentile and in the borderline delayed range. *Id.* at 367. E.L.F.'s composite score on the VABS-2 "place[d] his overall adaptive development at the 3rd percentile and within the [m]oderately low range," indicating "development almost two standard deviations below the mean." *Id.* at 368.

On April 28, 2014, Ms. Helms administered the Preschool Language Scales, 5th Edition, and the Goldman-Fristoe Test of Articulation, 2nd Edition. She found that E.L.F.'s receptive language skills were in the 12th percentile, indicating a "mild delay, specifically in the areas of 'wh' question comprehension and ability to follow multi-step commands." *Id.* at 372, 375. She found that E.L.F.'s expressive language skills fell in the 18th percentile, and his articulation skills in the 85th percentile, indicating that both were within normal limits. *Id.* at 373-74.

On September 3, 2014, school counselor Keri Raymond, M.S. and C.A.S., and special education teacher Janine E. Holden, M.S.Ed., evaluated E.L.F. in his 6:1:1 classroom. Ms. Raymond observed that E.L.F.

> needs clear expectations and a highly consistent, structured, environment in order to be successful. He needs adult support giving him verbal and physical prompts throughout the day in order to transition and interact with his peers. [He] has a very difficult time waiting his turn and needs adult verbal and physical support at structured group to be successful. . . . [He] has a difficult time appropriately initiating and maintaining interactions without adult support. He frequently teases his peers but is able to interact appropriately when verbal models are given. [He] also needs to increase his ability to independently do tasks. He often gives up and asks for help before trying new things.

7

*Id.* at 386. Ms. Holden made similar observations:

> [E.L.F.] has moderate delays in the areas of behavior, socialization, academics, [and] gross and fine motor skills. [He] requires individualized attention and physical intervention daily to: organize his environment, follow through with consistent classroom expectations and limits, and transition between activities in the classroom and the building. He frequently teases peers and needs 1:1 support daily to help problem solve and initiate play with peers. Without staff support, [he] will scream, cry, push over, and take toys from peers.
>
> At times when [he] does not get a desired response from an adult or peer, or cannot accept a limit, he responds with tantrums that can last up to 10 minutes, and refuses to participate. He continues to have difficulty using words at times; difficulty retrieving new language learned throughout the day and has moderate delays with social language. While he will follow a verbal model of a social script, it is not conclusive that [E.L.F.] understands what he is repeating.

*Id.* at 387.

Based on these evaluations, the Preschool Committee recommended special education services and completed an Individualized Education Plan ("IEP") for E.L.F. That 2014-2015 IEP, completed December 2, 2014, included 12-month school, placement in a 6:1:1 classroom, individual occupational therapy three times a week for 30 minutes, individual physical therapy twice a week for 30 minutes, small group counseling twice a week for 30 minutes, and individual parent counseling twice a month for one hour. *Id.* at 409.

In March 2015, BPS's Committee on Special Education (the "School Committee") conducted additional psycho-educational evaluations in preparation for E.L.F.'s entering kindergarten. The Beery Test of Visual-Motor Integration, 6th Edition, and Bruinink's Oseretsky Test of Motor Proficiency, 2nd Edition, showed that E.L.F.'s "sensory-motor integration skills appear[ed] to be developing within normal limits" but that he showed "delays in gross motor, fine motor and visual-motor integration skills." *Id.* at 210. His

8

performance on the fine motor control and manual coordination subtests placed him in the 1st percentile in his peer group.  *Id.* at 208, 217.  According to the evaluator, these delays would "interfere with [his] ability to master handwriting as well as his ability to keep up with classmates on written assignments and during the performance of fine motor adaptive skills (ie: tracing, cutting, coloring, and the use of classroom manipulatives)."  *Id.* at 210.  The Clinical Evaluation of Language Fundamentals – Preschool, 2nd Edition, showed that E.L.F.'s receptive language skills placed him in the 3rd percentile among his peer group.  *Id.* at 217.  His expressive language skills fell in the 19th percentile, language content skills in the 6th percentile, and language structure skills in the 9th percentile.  *Id.*  Finally, re-testing using the PDMS-2 showed that E.L.F., then 58 months old, fell in the 9th percentile (39 months) on ball skills, 5th percentile (35 months) in locomotion skills, and 25th percentile (48 months) in stationary skills.  *Id.*

Based on these evaluations, the School Committee recommended that E.L.F. be placed in a 12:1:1 kindergarten classroom for the 2015-2016 school year and that he receive individual occupational therapy twice a week for 30 minutes, individual physical therapy twice a week for 30 minutes, small group counseling once a week for 30 minutes, and small group speech and language therapy three times a week for 30 minutes.  *Id.* at 215.  The 2015-2016 IEP further noted that E.L.F.

> requires a repetitive and structured routine, small group opportunities to interact with peers, verbal models and verbal prompting to help stay on task and get his needs met, frequent positive reinforcement with tangible and edible rewards, calm down strategies to help regulate his emotions when upset, and specific social skills . . . to help develop age appropriate social skills.

*Id.* at 221.

On May 11, 2015, Ms. Holden completed a report documenting E.L.F.'s progress toward his 2014-2015 IEP goals. *Id.* at 233-38. E.L.F. made "less than anticipated progress" toward his social/emotional/behavioral goal of "us[ing] appropriate language." *Id.* at 235. According to Ms. Holden, E.L.F. "continue[d] to need verbal models to interact appropriately with peers," "will initiate play with peers only when prompted," and "follows routine directions but often becomes confused when other directions are given and needs adult support to comply." *Id.* He similarly did not make satisfactory progress on six of his eight motor skills annual goals. *Id.* at 236.

Finally, Tracey Thomas, E.L.F.'s kindergarten special education teacher, completed a teacher questionnaire on April 19, 2016. She noted that E.L.F. "works better one-on-one. Working independent[ly] is a difficult task for [him]." *Id.* at 254. She further noted that he "has to be redirected often." *Id.* at 255.

### B. Jennifer Meyer, M.D.

Dr. Meyer, a state agency medical consultant and pediatrician, assessed E.L.F.'s capabilities based on the record as of June 5, 2014. She reviewed evidence from Diversified Hearing and Balance Center, received May 22, 2014; Allentown Pediatrics & Adolescent Physicians, received May 20, 2014; Ross Eye Institute, received May 15, 2014; Robert Warner Children's Center, received May 13, 2014; an unknown source, received May 12, 2014; and another unknown source, received April 24, 2014. *Id.* at 93. Dr. Meyer opined that E.L.F. exhibited no limitations in the domain of attending and completing tasks; less-than-marked limitations in the domains of acquiring and using information, interacting with others, caring for others, and health and physical well-

being; and marked limitations in the domain of moving about and manipulating objects. *Id.* at 94-95.

### C. Allentown Pediatrics

Annarino submitted additional evidence to the Appeals Council, including evaluations completed by Daryl Ehlenfield, M.D., of Allentown Pediatrics and Adolescent Medicine. *Id.* at 46-75. Included in this submission was a June 21, 2016 report in which Dr. Ehlenfield diagnosed E.L.F. with a specific developmental disorder of motor function, an unspecified developmental disorder of speech and language, an unspecified behavioral/emotional disorder with onset occurring in childhood or adolescence, obesity, congenital pes planus (flat feet), and unspecified esotropia. *Id.* at 66. These diagnoses persisted through at least July 24, 2017. *Id.* at 49.

Also included in the Appeals Council submission was a July 11, 2016 medical statement completed by Dr. Ehlenfield. *Id.* at 73-75. In that statement, Dr. Ehlenfield opined that E.L.F. had moderate limitations in the domain of moving about and manipulating objects; marked limitations in the domains of acquiring and using information, caring for self, and health and physical well-being; and extreme limitations in the domains of attending and completing tasks and interacting and relating with others. *Id.* at 74-75.

## IV. THE ALJ'S DECISION

The ALJ first determined that E.L.F. was born on July 19, 2010, and therefore was preschool-aged when the application was filed on January 30, 2014. *Id.* at 18. At step one, the ALJ found that E.L.F. had not engaged in substantial gainful activity since the application date. *Id.* At step two, the ALJ found that E.L.F. suffered from two

11

severe impairments: "developmental delays" and "nystagmus," a "vision condition in which the eyes make repetitive, uncontrolled movements." *Id.* Although the ALJ found these impairments to be severe, at step three he determined that they did not meet or equal any of the Childhood Listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 19.

The ALJ determined that E.L.F.'s nystagmus was "not accompanied by the necessary findings to satisfy any of the visual impairment listings in either the general or children's listings." *Id.*

The ALJ also determined that E.L.F.'s developmental delays did not meet listing 112.05 (intellectual disability) because his "IQ scores [were not] low enough to satisfy the initial diagnostic criteria and there [were] no other factors . . . documented in the record[ ] which would [otherwise] satisfy the criteria." *Id.* Similarly, E.L.F.'s mental impairments did not meet listing 112.10 (Autism and Other Pervasive Developmental Disorders) because "the severity of [his] delays [was] not significant enough compared to age norms to satisfy any of the relevant criteria of 112.10 or any of the other child disability mental impairment listings." *Id.*

The ALJ further determined that E.L.F.'s impairments did not functionally equal any of the above listings. In addressing E.L.F.'s symptoms, the ALJ followed a two-step process to evaluate whether (1) there was an underlying medically determinable physical or mental impairment that could be expected to produce his symptoms and (2) the intensity, persistence, and limiting effects of his symptoms interfered with his functioning. *Id.* at 20. As part of his analysis, the ALJ addressed E.L.F.'s abilities in each of the six domains and found that while his "medically determinable impairments

could reasonably be expected to produce the alleged symptoms . . . , [Annarino's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." *Id.* at 21.

For example, in the domain of acquiring and using information, the ALJ found "significant limitations" but concluded that they were "not far enough off of the norm . . . to meet the definition of marked or extreme limitation." *Id.* at 26. In the domain of attending and completing tasks, the ALJ found "some delays" but concluded that they did not rise to the level of "marked or extreme." *Id.* at 27. And in the domain of moving and manipulating objects, the ALJ found evidence supporting a "marked"—but not an "extreme"—level of limitation and therefore concluded that these delays did not "in and of [themselves] . . . support a finding of disability." *Id.* at 29-30.

In reaching this determination, the ALJ accorded "significant weight" to the opinion of the consultative, nonexamining physician Dr. Meyer. The ALJ found that "[a]lthough Dr. M[e]yer never examined [E.L.F.] . . . [and] did not have an opportunity to consider the testimony at the hearing or other significant medical evidence and educational records later added to the record," nothing in the newer evidence was "inconsistent with Dr. M[e]yer['s] assessment, or substantially inconsistent with the records on which Dr. M[e]yer had based that assessment." *Id.* at 24. The ALJ also gave significant weight to the opinion of Ms. Holden, as well as to "the observations and opinions of the educational evaluating sources who contributed to the [BPS] multidisciplinary evaluation[s]." *Id.*

## STANDARD OF REVIEW

"The scope of review of a disability determination . . . involves two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). The court "must first decide whether [the Commissioner] applied the correct legal principles in making the determination." *Id*. This includes ensuring "that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Social Security Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). Then, the court "decide[s] whether the determination is supported by 'substantial evidence.'" *Johnson*, 817 F.2d at 985 (quoting 42 U.S.C. § 405(g)). "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles." *Johnson*, 817 F.2d at 986.

## DISCUSSION

### I.    THE PLAINTIFF'S CLAIMS

Annarino advances three arguments. First, she argues that the ALJ failed to properly consider evidence of E.L.F.'s structured and supportive school environment when evaluating his functional domains. Docket Item 13-1 at 8. Second, she argues

14

that the ALJ erred in relying on the opinion of Dr. Meyer, a non-examining review physician, because Dr. Meyer lacked access to all of E.L.F.'s records. *Id.* at 13. Finally, Annarino argues that the Appeals Council failed to properly evaluate evidence submitted after the ALJ rendered his decision. *Id.* at 15. The Court agrees that the ALJ committed legal error in failing to consider E.L.F.'s school-based evaluations in the context of his restrictive setting. Accordingly, it remands the matter to the Commissioner without further consideration of Annarino's remaining arguments.[1]

## II.  ANALYSIS

Annarino argues that the ALJ failed to properly account for E.L.F.'s structured and supportive school environment in assessing his teachers' and other school-based treatment providers' evaluations. Docket Item 13-1 at 8. More specifically, Annarino argues that the ALJ's failure to account for E.L.F.'s restrictive setting resulted in an erroneous finding that E.L.F. did not exhibit marked limitations in the domains of acquiring and using information[2] and attending and completing tasks[3]. *See id.* at 8-13.

---

[1] Where an ALJ fails to "apply the proper legal standard, the Court will decline . . . to consider whether substantial evidence exists to support the findings the ALJ made." *Bonet ex rel. T.B. v. Colvin*, No. 1:13-CV-924, 2015 WL 729707, at *7 (N.D.N.Y. Feb. 18, 2015).

[2] "[Preschoolers] should begin to learn and use the skills that will help [them] to read and write and do arithmetic when [they] are older. For example, listening to stories, rhyming words, and matching letters are skills needed for learning to read. Counting, sorting shapes, and building with blocks are skills needed to learn math. Painting, coloring, copying shapes, and using scissors are some of the skills needed in learning to write. Using words to ask questions, give answers, follow directions, describe things, explain what [they] mean[ ], and tell stories allows [preschoolers] to acquire and share knowledge and experience of the world around [them]." 20 C.F.R. § 416.926a(g)(2)(iii).

[3] "[Preschoolers] should be able to pay attention when . . . spoken to directly, sustain attention to . . . play and learning activities, and concentrate on activities like

When a claimant is in a structured educational setting, the ALJ must evaluate the effect of that setting on the claimant. 20 C.F.R. § 416.924a(5)(iv)(C). Because such a setting "may minimize signs and symptoms of [the claimant's] impairment(s)," the ALJ must "consider [the claimant's] need for a structured setting and the degree of limitation in functioning [the claimant has] or would have outside the structured setting." *Id.* "Even if [the claimant is] able to function adequately in the structured or supportive setting, [the Commissioner] must consider how [the claimant] function[s] in other settings and whether [he or she] would continue to function at an adequate level without the structured or supportive setting." *Id.* For example, "if [the claimant's] symptoms or signs are controlled or reduced in a structured setting," the ALJ must "consider. . . the amount of help [the claimant needs] from [his or her] parents, teachers, or others to function as well as [he or she does]; adjustments [made] to structure [the claimant's] environment; and how [the claimant] would function without the structured or supportive setting." *Id.* at § 416.924a(b)(5)(iv)(E).

Here, the ALJ claimed that he had evaluated E.L.F. "as compared with other children the same age who do not have impairments" and considered "the type, extent, and frequency of help [E.L.F.] needs to function." Docket Item 10 at 19. But there is no indication that the ALJ factored E.L.F.'s structured environment into his evaluation. In fact, the ALJ made "no effort to determine whether [E.L.F.] can 'function independently,

---

putting puzzles together or completing art projects. [Preschoolers] should also be able to focus long enough to do many more things by [themselves], such as getting [their] clothes together and dressing [themselves], feeding [themselves], or putting away [their] toys. [They] should usually be able to wait [their] turn and to change [their] activity when a caregiver or teacher says it is time to do something else." 20 C.F.R. § 416.926a(h)(2)(iii).

16

appropriately, and effectively in an age-appropriate manner outside of [his] highly structured setting.'" *Bonet ex rel. T.B. v. Colvin*, No. 1:13-CV-924, 2015 WL 729707, at *6 (N.D.N.Y. Feb. 18, 2015) (quoting *Marine ex rel. Paez v. Commissioner, SSA,* No. 94cv4577, 1996 WL 97172, at *8 (S.D.N.Y. Mar. 5, 1996)).

For example, in the domain of attending and completing tasks, the ALJ explained that E.L.F. did not exhibit marked limitations because his 2014-2015 IEP stated that he "had been able to sit for teacher directed activities for up to 10 minutes with minimal verbal prompting, identify numbers, [ ]rote count to 10, and was able to follow the class routine." Docket Item 10 at 27. The ALJ reached the same conclusion in the domain of acquiring and using information because Ms. Holden, E.L.F.'s preschool special education teacher, had noted in December 2014 that "he continued to make gains in all areas" and because Dr. Meyer had "opined that the [E.L.F.] ha[d] a less than marked limitation in [that domain]." *Id.* at 26. But the ALJ's conclusions are undercut by his failure to acknowledge and consider the fact that the 2014-2015 IEP and Ms. Holden's December 2014 evaluation were completed in the context of E.L.F.'s highly structured 6:1:1 classroom. *See id.* at 411.

Only a few months earlier, in September 2014, Ms. Holden had observed that "when [E.L.F.] does not get a desired response from an adult or peer, or cannot accept a limit, he responds with tantrums that can last up to 10 minutes, and refuses to participate." *Id.* at 387. She went on to explain that, "[w]ithout staff support, [E.L.F.] will scream, cry, push over, and take toys from peers." *Id.* She opined that he "requires individualized attention and physical intervention daily to: organize his environment,

17

follow through with consistent classroom expectations and limits, and transition between activities in the classroom and the building." *Id.* at 387.

In another report completed on the same day, E.L.F.'s school counselor, Ms. Raymond, opined that E.L.F.—even in his small classroom— "needs clear expectations and a highly consistent, structured, environment in order to be successful. He needs adult support giving him verbal and physical prompts throughout the day in order to transition and interact with his peers." *Id.* at 386. And E.L.F.'s 2015-2016 IEP reflected his continued need for a structured setting. *See, e.g.*, *id.* at 221 (noting that E.L.F. "requires a repetitive and structured routine, small group opportunities to interact with peers, verbal models and verbal prompting to help stay on task and get his needs met, frequent positive reinforcement with tangible and edible rewards, calm down strategies to help regulate his emotions when upset, and specific social skills . . . to help develop age appropriate social skills").

In short, at least two educational professionals as well as the School Committee—all of whose opinions were given significant weight by the ALJ, *id.* at 24—specifically noted the importance of a highly-structured environment to E.L.F.'s achieving developmentally-appropriate behavior. The ALJ therefore was required to consider the extent to which the highly structured nature of E.L.F.'s preschool classroom may have contributed to the behavioral improvements noted in his 2014-2015 IEP, as well as "the degree of limitation in functioning [he] . . . would have outside [that] setting." 20 C.F.R. § 416.924a(5)(iv)(C). But the ALJ did not do that.

The ALJ's failure to evaluate E.L.F.'s ability to function outside his structured special education classroom was legal error. *See Bonet*, 2015 WL 729707, at *8

18

(finding legal error where "the ALJ failed to consider the effects of [the claimant's] highly structured school environment on his ability to attend and complete tasks, and made no effort to compare that environment to a non-structured one"); *Marine*, 1996 WL 97172, at *8 (explaining that "the ALJ must consider the effect that a structured or highly supportive setting, such as a 'special classroom' or the 'home,' may have on children who 'spend much of their time in [these] settings' (quoting 20 C.F.R. § 416.924c(d))). Accordingly, the Court remands this case so that the ALJ can properly evaluate the effect that a structured school setting had on E.L.F.'s limitations—especially in the domains of acquiring and using information and attending and completing tasks. "Given the need to apply the proper legal standard, the Court will decline at this time to consider whether substantial evidence exists to support the findings the ALJ made," *Bonet*, 2015 WL 729707, at *7.[4]

---

[4] On remand, the ALJ should evaluate Dr. Meyer's opinion in light of whether Dr. Meyer also considered—and reached conclusions consistent with other evaluators who considered—the effect of E.L.F.'s supportive classroom setting on his behavior. In addition, the ALJ should address the July 11, 2016 opinion of E.L.F.'s treating physician, Dr. Ehlenfield. The Appeals Council found that Dr. Ehlenfield's opinion "did not show a reasonable probability" of changing the outcome of the case. Docket Item 10 at 6. But that is difficult to reconcile with Dr. Ehlenfield's finding of marked limitations in three domains and extreme limitations in two others, *id.* at 74-75, especially given the deference owed to the opinion of a treating physician, *see Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019) ("[T]he opinion of a claimant's treating physician as to the nature and severity of [an] impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" (brackets in original) (quoting *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(c)(2)))).

19

## **CONCLUSION**

For the reasons stated above, the Commissioner's motion for judgment on the pleadings, Docket Item 16, is DENIED, and Annarino's motion for judgment on the pleadings, Docket Item 13, is GRANTED in part and DENIED in part. The decision of the Commissioner is VACATED, and the matter is REMANDED for further administrative proceedings consistent with this decision.

SO ORDERED.

Dated: October 18, 2019
Buffalo, New York

*s/ Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE